(No. 20311.—

CHARLES PULFREY *et al.* Appellees, *vs.* GEORGE WID *et al.* Appellants.

*Opinion filed October 25, 1930.*

SINDEN & HASSELL, (CLYDE C. FISHER, of counsel,) for appellants.

ERIC WINTERS, HARRY HAMILL, and FRANK A. RAMSEY, for appellees.

Mr. JUSTICE HEARD delivered the opinion of the court:

This is an appeal from a decree of the superior court of Cook county declaring null and void and canceling a deed from Albert Sonnberg to Samuel Susina for certain real estate, and one from Susina to Albert Sonnberg, George Wid and Minnie Wid, as joint tenants, for the same real estate, and directing the Wids to deliver up said deeds to be canceled by the clerk of the court.

Prior to the making of the deeds here in question appellee Albert Sonnberg was the owner of the real estate in question as surviving joint tenant, the premises having been purchased in joint tenancy in his name and that of his wife, Wilhelmina, who died in 1919. In 1926 the Pulfreys, who filed the original bill in this case, entered into a contract with Sonnberg for the purchase of the premises. An abstract of title was brought down to date, and it showed

that there had been previously recorded a deed from Sonnberg to Susina, and another from Susina to Sonnberg and appellants, George Wid and Minnie Wid, in joint tenancy. Sonnberg then deeded the property to the Pulfreys, and they filed a bill to cancel the two deeds, alleging that they constituted a cloud upon the title. The Pulfreys afterwards deeded the property back to Sonnberg, who was made an additional party complainant in the supplemental bill and the Pulfreys were dismissed out of the suit. The bill alleged that Sonnberg never knew Susina and never made and executed a deed to him knowing the same to be a deed, and that his name on the deed was either a forgery, or if genuine was obtained from him by some fraudulent means by Susina or the Wids; that he never desired or intended to convey an interest in the premises to Susina or the Wids; that he never received any consideration for the making of the deeds, and that the deeds were made and placed on record for the purpose of clouding Sonnberg's title. Appellants claim that the Susina deed was fully explained to Sonnberg prior to its execution and that the consideration therefor was care and attention given to Sonnberg and to his wife in her lifetime, for which Sonnberg had agreed to make a will giving the premises to appellants, and the further consideration of looking after Sonnberg's property and future care to be given him.

The Sonnbergs and the Wids were friendly, and during the lifetime of Mrs. Sonnberg a will was made by the Sonnbergs naming the Wids as devisees, but Sonnberg testifies he did not know he was making a will when he signed it, and that when someone read it to him he destroyed it and told Wid that he had destroyed it. This occurred after the death of Mrs. Sonnberg. The evidence shows that after Mrs. Sonnberg's death, from time to time the Wids performed services for Sonnberg in the hope or expectation that as he had no lineal descendants and they were his most intimate associates they would be rewarded by a de-

vise of his property. Wid attended to the placing of his insurance and all his business affairs. A fiduciary relation existed between them. About two years after Mrs. Sonnberg's death Sonnberg destroyed a will he and his wife had made in favor of the Wids and informed Wid of this fact. From this point the testimony of the parties is in direct conflict. Wid testified: "When I found Mr. Sonnberg had destroyed the will I said to him, 'We cannot keep doing this forever; you have to do something to protect us,' (that was in case something happened to him,) otherwise we would refuse to do anything more for him. So I told him a will was no good—it could be destroyed; that the thing to do was to put it in joint tenancy in his name with my wife and myself, and he said that was all right to do and to go ahead and do it, which I did. I went over to attorney Sinden, who drew up the papers. He told me it would have to be deeded to Mr. Susina, who was a lawyer in his office at that time, and he would deed it back to Mr. Sonnberg, my wife and myself. I brought the papers home one Saturday evening. Mr. Sonnberg was over to the house to supper and he asked me if I had taken care of the papers, and I told him I had them in my pocket; that Mr. Sinden had told me that it was to be deeded to Mr. Susina, who would deed it back to us in joint tenancy. Mr. Sonnberg said that would be all right. I said that after supper we would go over to Mr. Blatter and have him acknowledge the deed, which I did. I introduced him to Mr. Blatter and explained to Mr. Blatter what we wanted to do. I said to Mr. Blatter that we wanted him to acknowledge the deed because Mr. Sonnberg said that we had done a whole lot of things for him and he wanted us to get the property in case anything happened to him. Mr. Blatter read the deed over and explained it to Mr. Sonnberg and asked him if he knew what he was doing. Mr. Sonnberg told him that is what he wanted done. Then Mr. Blatter took the acknowl-

edgment from him. Then I brought the deeds down to Mr. Sinden. They were recorded and I got them back."

Edward H. Blatter, an undertaker, testified: "I remember an occasion in September, 1920, between six and seven P. M., when Mr. Sonnberg and Mr. Wid called at my office. At that time I was a notary public. Mr. Wid came in with a gentleman and introduced him to me. He is sitting right here, and he told me that he wanted to have me take an acknowledgment of a deed. I looked the deed over—read it over—and they told me that it was for the purpose of deeding the property over in joint tenancy to Mr. and Mrs. Wid and Mr. Sonnberg. I read the deed over to Mr. Sonnberg and asked him if he knew what he was doing and if that is what he wanted done. He said, 'Yes; that is what I want done.' "

Sonnberg's version of this transaction as given in his testimony is entirely different. He testified that the first he knew of the deeds here in question was when it was ascertained from the abstract, at the time of his contract of sale with the Pulfreys, that such deeds had been recorded; that the matter of a deed in joint tenancy with the Wids had never been mentioned to him by anyone; that on the night when they purported to have been executed Wid took him for a ride and they went to Blatter's undertaking place, and he there signed a small paper which Wid told him "to just sign his name—that it was nothing;" that he did not have his glasses with him and could not read the paper; that no one said anything about the paper being a deed; that if they had said it was a deed he would not have signed it; that at that time he had known Wid about fifteen years and thought he was a friend; that when Wid told him to sign his name and said that it was nothing he just signed his name to the paper and did not ask what it was.

It seems scarcely credible that just after destroying the will in favor of the Wids, by which Sonnberg would not divest himself of any interest in the property in his life-

time, he would sign a deed for the purpose of giving to the Wids in joint tenancy a present interest therein equal to his own. Accepting Wid's version as true, the understanding was that the papers to be executed were not intended to give the Wids a present interest in the property, but only "something to protect" the Wids so that they would get the property "in case anything happened to Sonnberg." It is evident that none of them understood the force and effect of a deed in joint tenancy. Sonnberg remained in the exclusive possession of the property, living in filth and squalor in one room on the second floor of the premises. He collected and appropriated to his own use the rent of the building and paid for the repairs, taxes, assessments and insurance. About three years after the date of the deed he gave Wid $57 to have the building on the premises insured for five years and Wid procured for him two policies for $1500 each. Each policy was payable to Albert and Wilhelmina Sonnberg, and each contained a provision that the policy should "be void if the interest of the insured is other than that of sole ownership." Wid had the papers prepared by his own lawyer without Sonnberg being present. Susina was not present at the undertaker's when the deed to him was signed by Sonnberg. There is no evidence that he ever saw it. His execution of the joint tenancy deed was not coincident with the deed to him. There is no evidence that Sonnberg ever saw the joint tenancy deed or was informed of its execution prior to the discovery of its record upon the examination of the abstract. It is undisputed that the instruments conveying title to defendants and complainant in joint tenancy were recorded by Wid, returned to Wid from the recorder and remained in his possession and control and that the Wids thereafter never mentioned the subject to complainant. Sonnberg was aged and illiterate, and the transcript of his testimony shows that he had a very poor command and understanding of the English language. He reposed trust and

confidence in Wid, and by reason of such trust and confidence Wid secured the execution of the deed to Susina.

The law is well settled that where a fiduciary relation exists it is incumbent upon one who receives the benefit of an agreement made under such relationship to show that the agreement was just and fair. Where two persons stand in such relationship that confidence is necessarily reposed by one in the other, and an influence which naturally grows out of that confidence is abused while such confidence continues or an advantage is obtained by reason of such influence over the confiding party, the person seeking such advantage will not be permitted to retain the same although the transaction could not have been impeached if such confidential relation had not existed. This is true regardless of the existence of actual fraud, undue influence or coercion. (*Housewright* v. *Steinke,* 326 Ill. 398.) If a person obtains the legal title to property by virtue of a confidential relation and influence, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust, by construction, out of such circumstances or relations. This trust they will fasten upon the conscience of the offending party and will convert him into a trustee of the legal title and order him to hold it or execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society. (*Kochorimbus* v. *Maggos,* 323 Ill. 510.) When these rules are applied to the facts of this case it must be held that the decree of the superior court was in accordance therewith.

The decree is therefore affirmed. *Decree affirmed.*