FRANK M. KELLY, DR. JOHN B. HALES, DR. A. G. PLANKERS, HENRY FELTGEN, *Plaintiff and Respondents,*

v.

ARTHUR R. SMYTHE, FRANK P. DILGER, RAYMOND J. DILGER, HELENA DILGER, and CHAS. E. TAYLOR, *Defendants and Respondents,*

SECTION THIRTY OIL COMPANY, a Corporation, *Defendant and Appellant.*

(No. 2298; March 27th, 1945; 157 P. 2d 289)

212

For the plaintiffs and respondents the cause was submitted upon the brief of E. C. Raymond, Esq., of Newcastle, Wyoming, and Edward C. Tschudi, Esq., of Dubuque, Iowa, and oral argument by Mr. Raymond.

For the defendant appellant the cause was submitted upon the brief of Preston T. McAvoy, Esq., of Newcastle, Wyoming, and Henry J. Grannis, Esq., of Duluth, Minnesota.

## OPINION

BLUME, Chief Justice.

This is an action brought by the plaintiffs against the defendants which relates to an oil and gas lease and the personal property on the lands covered by the lease. The court rendered a judgment against Section Thirty Oil Company, a corporation, one of the defendants, and declared the amounts due plaintiffs and other claimants to constitute a lien upon the property. From that judgment the corporation just mentioned has appealed to this court.

The record in the case is quite voluminous. In the view we take of the case, however, some of the testimony introduced in the case need not be specifically mentioned, and the salient facts herein appear to be as follows:

Prior to July 15, 1940, the plaintiffs and R. A. Bechttold and Frank P. Dilger and his associates were the owners of an oil and gas lease covering all of Section

30, Township 46, N., Range 63, West of the 6th P. M., all situate in the County of Weston, Wyoming, excepting only the South Half (S½) of the Southwest Quarter (SW¼) of Section 30. The lease had been acquired from one H. S. Glenn to whom was owing on the purchase price approximately the sum of $3500.00, hereafter referred to as owing to the Glenn Estate. On the date above mentioned the lease had expired but it contained a preference right of renewal. The plaintiffs herein and R. A. Bechtold, who had invested certain amounts of money in the property, along with Frank P. Dilger and his son and daughter, wanted to dispose of their interests which they had therein. Frank P. Dilger, who had probably in the first place, interested the others in the property, told the plaintiffs that he knew Arthur R. Smythe, one of the defendants herein, who might be able to get a renewal of the lease and to take over the property and pay off the amount which the plaintiffs had invested therein. So the plaintiffs and R. A. Bechtold, and Frank P. Dilger and his son and daughter, on the one hand, and Arthur R. Smythe, an Attorney at Law, of Duluth, Minnesota, on the other hand, entered into a contract, dated July 15, 1940, reciting the lease above mentioned and the property situated on the land covered thereby, the amounts which the plaintiffs had invested therein, and the fact that they and R. A. Bechtold desired to retire and withdraw their interest which they had in the property. The contract proceeds to state as follows:

"Now Therefore it is agreed by and between the parties as follows:

"1. That Frank P. Dilger, Frank M. Kelly, R. A. Bechtold and Raymond J. Dilger have simultaneous with the execution of this agreement, assigned, transferred and set over to Arthur R. Smythe, the party of the second part, the oil and gas lease hereinbefore described and all preferential rights and priority rights thereunder to a new oil and gas lease.

"2. That parties of the first part have simultaneously with the execution of this agreement made and will forthwith deliver into the hands of Chas. E. Taylor, Auditor of the Northern National Bank of Duluth, Minnesota, a Bill of Sale to the personal property in such Bill of Sale described and herein referred to with the express understanding that said Chas. E. Taylor will not and shall not deliver to the party of the second part or his order such Bill of Sale until the party of the second part shall have done and performed the things by him to be done and performed all of which are hereinafter particularly set forth.

"3. The party of the second part agrees within six months from date of this agreement to pay to Frank M. Kelly, Dr. John B. Heles, Dr. A. G. Plankers, Henry Feltgen and R. A. Bechtold, not less than one-half ($\frac{1}{2}$) of their respective investments in the property as hereinbefore ascertained, determined and set forth and within one year from date of this agreement to pay the remaining one-half ($\frac{1}{2}$) of such investment to the said five parties.

"4. Upon the payment of such sums to the said Frank M. Kelly, Dr. John B. Heles, Dr. A. G. Plankers, Henry Feltgen and R. A. Bechtold, in full, and only then, shall the said Chas. E. Taylor deliver to the party of the second part or his order the said Bill of Sale.

"5. As to Frank P. Dilger, one of the parties of the first part and his son and daughter, as his associates it is contemplated, understood and agreed that disposition of his and their interests are the subject of a separate agreement between the party of the second part and him and his associates.

"6. The party of the second part agrees with the parties of the first part to diligently use his best efforts to obtain a new oil and gas lease from the United States of America and if such new lease is obtained, agrees and covenants with the parties of the first part that he will hold such lease in trust for them until he shall have fully performed the things to be done by him herein, and will not sell, alienate or incumber it until he shall have paid the several sums herein stipulated, by him to be paid to said five men, constituting all of the parties of the first part except Frank P. Dilger."

The contract further provided that Smythe should have the right to operate the property in an economical manner; that he should pay off the claim of H. S. Glenn (the Glenn Estate), but that he should not be personally liable in case he should not fulfill the terms of the contract.

The bill of sale and the contract mentioned above were delivered to Chas. E. Taylor as agreed. Smythe succeeded in obtaining a renewal of the oil and gas lease, the lease being dated April 1, 1940, and was issued to him. He evidently found difficulty in financing the project, and did not pay the debts agreed by him to be paid. So, after considerable negotiations, the contract of June 15, 1940, above mentioned, was modified by the parties, and it was agreed that a corporation should be organized for the purpose of taking over the oil and gas lease above mentioned and the personal property aforesaid; that the corporation so to be organized should pay the claims of the plaintiffs as well as that of R. A. Bechtold, H. S. Glenn, Raymond J. Dilger and Helena Dilger, and secure the payment by a lien on the property. The corporation was organized as agreed on April 29, 1942, under the name of Section Thirty Oil Company. The incorporators and first board of directors were Frank P. Dilger, Arthur R. Smythe and Lucille Daily, Secretary to Arthur R. Smythe, Frank P. Dilger acted as president of the corporation for the time being, but it seems that no formal organization meeting was held by the corporation until June 30, 1942. In the meantime, it seems, the bill of sale held by Chas. E. Taylor was delivered to Smythe, and he, in turn, assigned the oil and gas lease, and the personal property to Frank P. Dilger. Dilger in turn conveyed the property to the corporation pursuant to the resolution hereafter mentioned. On the last mentioned date, namely, June 30, 1942, the organizers and the first board of directors of the corporation met in Duluth,

Minnesota. Lucile Daily resigned as director and her place was taken by Henry J. Grannis, known in the record as Judge Grannis. By-laws of the corporation were adopted. The number of directors was increased to five and Val Johnson and Grant E. McLean were elected to fill these places. Immediately after the adjournment of the meeting of the stockholders, the board of directors held a meeting. Henry J. Grannis was elected president; Val Johnson, vice-president, and Grant E. McLean, secretary and treasurer, and the following resolution was adopted, leaving out immaterial and unimportant matters, to-wit:

"The corporation having been organized as a convenient instrumentality and vehicle for the purchase of the so-called Glenn Oil and Gas Lease in the Osage Oil Field in Weston County, Wyoming * * * and the personal property thereon situated and the business conducted thereon and therefrom, Director Arthur R. Smythe proposed and moved the adoption of the following resolution:

"BE IT RESOLVED: That the Section Thirty Oil Company, acting through its proper officers, be and is hereby authorized to acquire the Oil and Gas Lease issued by the United States of America to Arthur Ray Smythe, as lessee, and now owned and held by Frank P. Dilger under an assignment from said Arthur Ray Smythe * * * together with all of the personal property on said leased premises * * * subject to any outstanding indebtedness for said personal property, not exceeding $21,000.00, and which personal property, subject to outstanding indebtedness, is owned by Frank P. Dilger.

"BE IT FURTHER RESOLVED: That as the consideration for the purchase and assignment of said lease to said Section Thirty Oil Company and the transfer of said personal property to said company, subject to said indebtedness, the Board of Directors * * * pay therefor, on behalf of said company, the sum of $55,-000.00 * * * said purchase price may be paid by the issuance to Frank P. Dilger of stock of said corporation of the par value of $55,000.00.

"BE IT FURTHER RESOLVED: That said company, through its proper officers, shall have the right to pledge the property so to be acquired as security for the payment of all or any part of the unpaid purchase price of said personal property, on such terms as the Board of Directors in its judgment shall deem feasible and proper * * *.

"BE IT FURTHER RESOLVED: That the application the Securities Commission of the State of Minnesota for license to sell not to exceed twenty-five thousand shares of the common stock of said Section Thirty Oil Company, at par or such part thereof as said Board of Directors shall determine is expedient or necessary to sell or liquidate any unpaid part of the purchase price of said personal property or to be used for the purchase of further equipment and the conduct of further development work in connection with said Oil and Gas Lease or for other corporate purposes heretofore made by Frank P. Dilger, one of the incorporators and a director of said company, be and the same is hereby ratified and approved. * * *.

"BE IT FURTHER RESOLVED: That Frank P. Dilger be and he is hereby appointed General Manager of said company."

The substance of the foregoing facts appears in the petition of the plaintiffs which were substantially admitted in the answers of the defendants, Arthur R. Smythe and Frank P. Dilger. Section Thirty Oil Company, a corporation, and appellant herein, filed an answer, the substance of which is that it became an innocent purchaser for value. The trial court found that no judgment should be rendered against Arthur R. Smythe, Frank P. Dilger, Raymond J. Dilger or Helena Dilger; that judgment should be rendered against the corporation, appellant herein, and in favor of Frank M. Kelly, in the sum of $4661.34; in favor of A. G. Plankers in the sum of $500.00; in favor of Henry Feltgen in the sum of $3803.01; in favor of John B. Heles in the sum of $4424.54; in favor of Raymond J. Dilger in the sum of $1800.00; in favor of Helena Dilger in

the sum of $1568.00; and in favor of the H. S. Glenn Estate for the sum of $3500.00; that the said sums should constitute a lien upon the Oil and Gas Lease above mentioned and the personal property thereon and that execution should issue to enforce the lien after 90 days from the date of the judgment. Upon showing made, the rights of the Glenn Estate were subsequently by the court vested in Zella Blanche Phillips. The total claims for which judgment was rendered add up to $20,256.89. The record shows that the claim of R. A. Bechtold has been paid.

It clearly appears from the foregoing that the corporation, appellant herein, bought the Oil and Gas Lease and the personal property subject to an indebtedness not exceeding $21,000.00. It does not clearly appear therefrom that it was bought subject to the debts of the plaintiffs and the other claimants in whose favor the court rendered judgment. The corporation denies that it was. Hence, it is necessary to review some of the evidence in this case which will be done in connection with the various points raised herein by the appellant. The term "claimants" as hereafter used includes all the parties for whom judgment was rendered, unless the contents show otherwise.

I. As hereinbefore stated the corporation contends that it is an innocent purchaser for value and that it had no notice of the adverse interests of the claimants herein. The record is clear that the organizers of the corporation and the first board of directors, namely, Frank P. Dilger, Arthur R. Smythe and Lucile Daily, particularly Dilger and Smythe, had full knowledge of the indebtedness due to the claimants herein. It is argued by the corporation, however, that the knowledge which Frank P. Dilger had is not imputable to the corporation for the reason that his interests were adverse to the corporation. We have not been able to discover

any interest adverse or antagonistic to the corporation. It seems that at the time when the corporation took over the property he had a controlling interest in the corporation, being awarded $55,000.00 in stock at that time. His interest from a financial standpoint would seem to be identical with that of the corporation rather than adverse to it. If the interest of the corporation was to defeat the claims of the plaintiffs and the other parties interested, then that was true of Dilger unless it be that of the son and daughter on account of family relationship. Smythe was situated likewise. He had been promised 10,000 shares of the corporation. He was not, in accordance with the contract with plaintiffs, liable to them individually. Hence, his interest, too, seems to have been identical with that of the corporation and no adverse or antagonistic interest to the corporation seems to be discernible. It would seem that under the circumstances Dilger and Smythe may well be said to have been the principal parties who represented both the corporation as well as the plaintiffs. However that may be, the fact of the indebtedness up to $21,000.00 was made known by the minutes of the corporation. It was open for everyone then and thereafter interested in the corporation to see. If there was any concealment, it was only as to the ownership of the indebtedness, and we can, under the circumstances, conceive of no purpose of concealing that, inasmuch as the minutes of the corporation recite that it was organized for the express purpose of being the instrumentality of acquiring the lease and personal property subject to the indebtedness above mentioned. It is not in accordance with the probabilities of human conduct that when such indebtedness was known, those interested in the corporation would make no inquiries as to the ownership thereof, if they had not already been previously advised, but blindly await the proof of such ownership by the owners thereof. We need not decide

whether or not the rule of probability in this connection itself would justify the court to hold that knowledge of the facts was possessed by the corporation. There is positive testimony in the record on that point. Mr. Smythe testified that he had drawn up a set of minutes for the corporation to adopt at its meeting of June 30, 1942, and that these minutes were in the hands of Judge Grannis, who, at that meeting was elected president. These minutes, drawn up by Mr. Smythe, contained, as the record shows, the names of the plaintiffs and that of Raymond J. and Helena Dilger and the Glenn Estate, owners of the indebtedness above mentioned and the amounts owing to them respectively. He testified further that he discussed the matter with Judge Grannis and specifically mentioned in his testimony that he communicated to him the names of these owners. Mr. Dilger, too, testified on the point. He stated in part as follows: "Q. And isn't it a fact that at that meeting (June 30, 1942), in the presence of the various stockholders of the corporation, including Judge Grannis, who is now president of the corporation, they were fully informed of the contract existing between Mr. Smythe and Mr. Kelly, Mr. Feltgen, Mr. Bechtold, Doctor Heles, and Doctor Plankers? A. Well, I think that they were, but they knew the obligation— there is no doubt about that, because Mr. Burke, an attorney up there, had the twenty-five thousand dollars of stock already sold and that was to pay these gentlemen. Q. Was that discussed at that meeting? A. Yes, sir, and his commission was discussed at that meeting. Q. Whose commission? A. Mr. Burke's. Q. How much money he was to receive for selling of the stock? A. Yes. Q. And the purpose of raising the money was to pay these very debts about which this suit is brought? A. Yes, sir, and go ahead and drill another well. Q. And the present president of the Company was there at that time—Judge Grannis? A. Yes. * * * Q. Was

there a discussion had in that meeting as to the indebtedness not to exceed twenty-one thousand dollars?
A. * * * Yes sir. Q. Now did you——you knew what that twenty-one thousand dollars was for, did you? A. Yes, sir. Q. What was that debt? A. The same debt that is right here. There was five hundred dollars from Mr. Plankers, forty-four hundred and some dollars from Dr. Heles, forty-six hundred and some dollars from Mr. Kelly, thirty-eight hundred and three dollars from Mr. Feltgen, eighteen hundred dollars from Raymond and fifteen hundred sixty-eight dollars from Helena and thirty-five hundred we still owed the Glenn estate; and that was discussed that day at that meeting and I was ordered to continue with getting the commission to grant us a license. We had money enough from what we had sold, providing we could get the license. Q. Now, you knew at the time of this meeting of this indebtednessfl, aggregating somewhat under twenty-one thousand dollars? A. Sir? Q. You knew of this, didn't you? A. Yes, I did. Q. And did you tell that Board of Directors and explain it to them, and talk to them about it? A .Well, I talked about it to them this way: I said 'What will I do with this money when I get it? Shall I send it in into the company or pay these myself, or pay it to Tschudi, and Mr. Grannis says, "The company will take care of that; you just send it here.' * * * Q. And was this application (to the Securities Commission) discussed at that organization meeting, that director's meeting? A. The only thing was that Pat Burke had the stock sold and we wanted to pay the obligations and in order to do that, to get the Commission to grant this as soon as possible, and I was instructed to go ahead and finish it. Q. And provision was made in this directors' meeting to carry out the completion of this application for license, is that true? A. Yes, sir. * * * Q. Now, pursuant to this directors' meeting, did you furnish any further showing with regard to this ap-

plication for license to sell stock? A. Yes, sir, I did.
* * * Q. Did you tell him (Judge Grannis) about these
obligations? A. Yes, you bet I did." It appears herein
that on June 16, 1942, prior to the foregoing meeting
of the stockholders and directors of the corporation,
Mr. Dilger, as president of the corporation, applied to
the Securities Commission of Minnesota for the sale of
$25,000 of stock of the corporation. The Securities
Commission asked for further information and, among
other things, wanted to be furnished the balance sheet
of the corporation, which is evidently the matter re-
ferred to in the foregoing testimony of Mr. Dilger, and
he thereupon furnished, among other things, such bal-
ance sheet which showed the liabilities to be as follows:

"LIABILITIES:

Accounts Payable

| | |
|---|---|
| Glenn Estate | $ 3,500.00 |
| J. B. Heles | 4,424.54 |
| Frank M. Kelley | 4,661.34 |
| A. G. Plankers | 500.00 |
| Henry Feltgen | 3,803.01 |
| Raymond J. Dilger | 1,811.00 |
| Helena Dilger | 1,568.00 |

Total Accounts Payable ............$20,267.89"

If Frank P. Dilger's testimony above mentioned is true
and he was instructed to complete the application to
sell stock, no good reason is perceivable why the bal-
ance sheet above mentioned, furnished by him, should
not be held to have conveyed information to the com-
pany. The witness Tschudi testified that he saw the
minutes of the corporation subsequently and sometime
in the fall of 1942 and that these minutes then con-
tained a repudiation of the contract between plaintiffs
and Mr. Smythe. It further appears that Judge Gran-
nis stated that he had seen the papers, consisting of
the contract of June 15, 1940, and the bill of sale, in
the hands of Charles E. Taylor at the bank above men-

tioned. In view of these disclosures in the record, we are unable to see how we can reverse the trial court on its findings on the point here under discussion. True, most, if not all, of the testimony outlined above was denied, but the conflict was for the trial court to settle.

II. The judgment of the trial court states, "It is, Therefore, Ordered, Adjudged and Decreed that judgment be and it is hereby rendered against the defendant, Section Thirty Oil Company, in the following amounts:" Then follow the amounts already mentioned above. A judgment cast in these terms perhaps constitutes a personal judgment against the appellant. Counsel for the corporation contend that though the property was bought subject to the indebtedness above mentioned, it is not personally liable to pay the debts. They correctly point out that there is a distinction between assuming a debt and purchasing property subject thereto. Pelser v. Gingold, 214 Minn. 281, 8 N. W. 2d 36; Brighetto v. Raney, 76 Cal. App. 232, 245 P. 235, 241; Consolidated Coal Company v. Peers, 166 Ill. 361, 46 N. E. 105, 38 L. R. A. 624. The plaintiff alleged in part, "That the incorporators and first Board of Directors knew full well of the obligations of the defendant Smythe under the contract herein pleaded, and that the defendant corporation is bound, as successor of the said Smythe, by the terms thereof." We are not certain that that constitutes a direct pleading that the corporation agreed to pay the debts of the claimants herein, although it comes, perhaps, close to it. The agreement to pay another's debt would ordinarily come within the statute of frauds. The testimony of Frank P. Dilger which was admitted without objection indicates, however, that the corporation agreed to pay the debt, that is to say, that it assumed it. Nowhere in the record is there any indication that the corporation raised the question of the statute of frauds and that must be done in order to be able to rely upon it. Davison v.

Nicholson, 37 Wyo. 412, 263 P. 605. It is probable that the corporation has no other property than the oil and gas lease and the personal property hereinbefore mentioned and the question of assumption of the debt, raised by the corporation, is probably unimportant and we need not definitely decide it.

The corporation acquired the property subject to the indebtedness against the lease and personal property in a sum not exceeding $21,000, and as more fully shown hereafter the property was acquired, we think, subject to a definite indebtedness owned by definite parties, not exceeding the sum mentioned. We take it that the phrase "subject to indebtedness" means the same as the phrase "subject to the payment of indebtedness." The term "subject to" means "subordinate to" or "subservient to." Englestein v. Mintz, 341 Ill. 48, 177 N. E. 746. In other words, the title which the corporation received was subservient to and subordinate to the rights of the owners of the indebtedness, which can mean nothing less than that the owners of the indebtedness have a right to and in the property conveyed, superior to that of the corporation. In Moerlein v. Heyer, 100 Tex. 245, 97 S. W. 1040, the court held that a devise of land subject to certain legacies means that the land shall first be devoted to the payment of the legacies,—in other words, that the legacies are a charge or a lien on the land. In Logan v. Glass, 136 Pa. Superior Ct. 221, 7 Atl. 2d 116, the court stated that: "It is well established in this Commonwealth that the words subject to the payment of money conditioning a devise of real estate ordinarily has the effect of creating a charge upon the land acquired thereby." To that effect is Hammond's Estate, 197 Pa. 119, 46 Atl. 935. Hudgson Administrator v. Gemmill, 5 Rawle 99, where the point is discussed at length and many cases are cited. There is no reason why the rule should be different in the case of a conveyance, and it was so

held in Logan v. Glass, supra. The debts in this case, accordingly, were a lien upon the property and the court rightly so held.

It is further claimed that in any event no lien should have been declared to exist against the lease, but only against the personal property. Part of the personal property consists of casing in wells on the property, and all of it is intimately connected with the land as oil and gas land. The land without personal property thereon would be worthless. The corporation took the property subject to any outstanding indebtedness "for such personal property." The quoted words merely express, we think, the purpose for which the money was paid. The purchase made by the corporation was one purchase, that of an oil and gas lease and the personal property, and we think that the resolution above mentioned means that the oil and gas lease, as well as the personal property, was bought subject to such indebtedness.

III. A great deal of the argument of the corporation, appellant herein, is devoted to other contentions that the claimants herein are not entitled to collect from appellant the money paid by them to Dilger in connection with the operations of the lease. Various reason are assigned,—for instance, because the claimants made investments, repayment of which they did not expect except out of the revenue derived from the operation of the oil and gas lease which had expired; that there is no indication that the notes given to some of the claimants were given for advancements on account of the oil and gas lease; that the claims herein were not properly proven, and that no contract for payment to Helena and Raymond J. Dilger was offered in evidence. All of these arguments seem to be based on the theory that the property was bought by the corporation not subject to the identical claims in con-

troversy there, but subject to an indefinite indebtedness of $21,000 ,which indebtedness should be proven according to the ideas of Judge Grannis, and which might or might not be proven. We fear that this is but a smoke screen thrown round the facts herein, and has its foundation, perhaps, in the hope of the directors of the corporation, suggested by the record, that the claimants might possibly be induced to accept stock in the corporation as payment, and we do not suggest that any dishonesty lurked in that hope, for we know, along with the rest of the world, that investments in oil and gas properties may often prove delusive. However, there is no merit whatever in the foregoing arguments if the corporation bought the property in question subject to the indebtedness of the claimants herein ,and in that event it is not necessary to examine the question as to whether or not the claims have been properly proven so far as the corporation is concerned. It is unfortunate, of course, that in the resolution of June 30, 1942, the specific claims of specific parties were not mentioned. Who was to blame for that we do not know. Frank P. Dilger, as a layman, could not be expected to look after the details contained in the resolution. It is of some significance that the resolution of the Board of Directors, introduced in evidence, does not require that evidence of the claims should be presented to the corporation of the validity of the claims. Frank P. Dilger and Smythe knew all about them. It was not unreasonable that the other directors should be willing to accept their judgment. If anyone knew of the validity of the claims it was Frank P. Dilger. He recognized them as valid, and he was the seller. There is scarcely any doubt that he considered one of the terms of the sale to be that the claimants herein should be paid their respective indebtedness, and, if his testimony is accepted as true, he communicated these terms to the Board of Directors. And the only question

remaining is as to whether or not the facts and circumstances herein indicate that these terms were accepted by the corporation. The resolutions drawn by Judge Grannis are not the only competent evidence on that point. 14 C. J. 921, 22 C. J. 970, 1088, 1277, 18 C. J. S. 1268. The balance sheet submitted by Dilger to the Securities Commission of Minnesota corroborates Dilger's testimony and if, as he stated, he was instructed to complete his application made to the Commission previously, then the inference would seem to be permissible that he was authorized to submit such balance sheet and then, of course, it would seem to be clearly established that the corporation bought the property subject to the claims of the claimants herein. There is no suggestion in the record that there were claimants in contemplation other than those mentioned in the decree of the trial court. The amount due claimants in the sum of $20,267.89 or $20,256.89, is so nearly the amount of $21,000, mentioned in the resolution of the corporation, as to suggest a close connection. That connection is also suggested by the fact that the corporation authorized the sale of $25,000 worth of stock. The resolution also authorized the pledge of the property to secure the unpaid purchase price for such property, which, too, is in conformity with the agreement between the claimants and Frank P. Dilger and Smythe. It is rather strange that a corporation should authorize the pledge of its property as security, if the $21,000 mentioned above consisted of claims which were uncertain and might or might not be proven. Furthermore, Dilger asked the directors, as he testified, whether he should personally—presumably out of the proceeds of sale of stock—pay the claimants or whether the Board wanted to do it, and he was told that "the company will take care of that." That can mean nothing less, under the circumstances, than that the company would pay the debts of the particular

claimants involved herein. Taking into consideration all the facts and circumstances in this case, the trial court was, we think, fully justified in finding that the appellant corporation herein agreed to purchase the property involved herein subject to the indebtedness of each and every one of the claimants as fixed by the judgment of the trial court, and hence, as we have already stated, they were entitled to a lien on the property conveyed to the corporation.

IV. In a reply brief, counsel for the corporation attack the form in which the action herein was brought. Plaintiffs prayed in part, for a declaration of rights, under the contract of June 15, 1940, and counsel object that the declaratory judgment statute is not applicable in this case. No objection on that ground was urged in the court below, or in the main brief of appellants. We need not consider such objection when first raised in the reply brief. Wyoming Investment Co. v. Wax, 45 Wyo. 321, 18 P. 2d 919; Claughton v. Johnson, 47 Wyo. 447, 38 P. 2d 612. Furthermore, the prayer of the petition appears to be broad enough to invoke the equity power of the court in connection with the various facts presented in the petition and the evidence.

Subject to the reservation heretofore made, the judgment of the trial court should, accordingly, be affirmed, and it is so ordered.

*Affirmed.*

RINER, J., and KIMBALL, J., concur.