**K N ENERGY, INC., doing business as Northern Utilities Division of K N Energy, Inc., a Kansas corporation, Appellant (Plaintiff),**

v.

**CITY OF CASPER, a Wyoming municipal corporation, Appellee (Defendant).**

No. 86–69.

Supreme Court of Wyoming.

May 11, 1988.

Rehearing Denied June 15, 1988.

Michael J. Sullivan, Tim I. Munson and William H. Brown of Brown, Drew, Apostolos, Massey & Sullivan, Casper, Robert C. McHugh and Thomas J. Carroll, III, Lakewood, Colo., for appellant.

H.B. Harden, Jr., City Atty., and Robert L. Mullen, Deputy City Atty., Casper, for appellee.

A.G. McClintock, Atty. Gen., Steven R. Shanahan, Sr. Asst. Atty. Gen., Roger C. Fransen, Asst. Atty. Gen., amicus curiae for Public Service Com'n of Wyoming.

Nicholas G. Kalokathis of Lathrop & Uchner, P.C., Cheyenne, amicus curiae for Wyoming Ass'n of Natural Gas Utilities.

Before BROWN, C.J., and THOMAS, CARDINE and MACY, JJ., and GUTHRIE, J., Retired.

THOMAS, Justice.

This case presents directly the question of the authority of a Wyoming municipality to regulate a public utility by enactment of a licensing ordinance. K N Energy, Inc., doing business as Northern Utilities Division of K N Energy, Inc. (Northern), instituted a declaratory judgment action in the district court seeking a declaration that the ordinance adopted by the City of Casper (Casper) is void. The district court declared specific provisions of the ordinance to be invalid and unenforceable because of conflict with the regulatory authority over public utilities assigned by statute to the Public Service Commission of Wyoming (PSC), but it sustained the balance of the ordinance adopted by Casper. We cannot agree that Casper had any authority to adopt the ordinance in issue, and we reverse the decision of the district court. It is our conclusion that the ordinance is void in its entirety because there exists no authority for a city to adopt such an ordinance.

Northern, in its Brief of Appellant, sets forth these issues in the appeal:

"1. Whether the District Court erred in not declaring Municipal Ordinance No. 16–85 of the City of Casper, State of Wyoming, entirely invalid, since the legislature of the State of Wyoming has exclusively preempted and totally occupied the field of public utility licensing and regulation?

"2. Whether the District Court erred in not declaring Municipal Ordinance No. 16–85 of the City of Casper, State of Wyoming, entirely invalid, since the City of Casper did not, and does not now, have the constitutional or statutory authority to ordain a municipal ordinance regulating and requiring the licensing of public utilities?

"3. Whether Municipal Ordinance No. 16–85 of the City of Casper, State of Wyoming, is unconstitutional since it singles out gas utilities to the exclusion of other competing utilities?"

Casper restates the issues in this way:

"1. Whether the Seventh Judicial District Court was correct in declaring valid certain portions of the gas company licensing ordinance of the City of Casper, State of Wyoming.

"2. Whether the city had authority to adopt the gas company licensing ordinance.

"3. Whether the gas company licensing ordinance of the City of Casper is unconstitutional."

The PSC and the Wyoming Association of Natural Gas Utilities sought and received permission to file amicus curiae briefs. In their briefs, they suggest single issues. The PSC asks the court to decide:

"What is the extent of Wyoming cities' and towns' power to regulate and to grant franchises to public utilities, relative to the powers of the Public Service Commission to regulate and to grant certificate authority to those utilities?"

The Wyoming Association of Natural Gas Utilities wants the court to decide:

"Whether municipalities have authority to regulate utilities by the adoption of a licensing ordinance?"

Northern is a public utility furnishing natural gas service in several Wyoming cities. Among those is Casper. As a public utility subject to regulation by the PSC, and, in accordance with its rules, Northern obtained a certificate of public convenience and necessity to furnish natural gas service to residents of Casper. Northern had obtained permission to use the streets and property of the city by entering into a franchise agreement with Casper, which also provided that Northern would furnish natural gas to Casper in accordance with the terms of that agreement. This franchise expired on December 31, 1984, and Northern and Casper have not been successful in agreeing upon the terms of a renewal franchise.

During this hiatus, the legislature adopted Ch. 172, S.L. of Wyoming 1985, which is compiled as § 15–1–103(a)(xxxiii)(C) and § 15–1–103(b), W.S.1977 (1987 Cum.Supp.). This statute became effective May 23, 1985, and, because its text is of significance in understanding the issues, it is attached as Appendix A to this opinion. Responding to

the adoption of this statute, Casper, on July 2, 1985, adopted Ordinance No. 16–85 entitled:

"AN ORDINANCE ESTABLISHING PROCEDURE AND REGULATIONS FOR A NON–EXCLUSIVE LICENSE TO ANY GAS COMPANY WITHIN THE CITY OF CASPER, WYOMING, OPERATING WITHOUT A FRANCHISE, A LICENSE TO CONSTRUCT, MAINTAIN, AND OPERATE IN, ON OR UNDER THE PRESENT AND FUTURE STREETS, ALLEYS, AND PUBLIC WAYS OF THE CITY OF CASPER, NATRONA COUNTY, WYOMING, A GAS DISTRIBUTION PLANT OR SYSTEM FOR THE PURPOSE OF SUPPLYING GAS AND GAS SERVICE TO THE CITY OF CASPER, THE INHABITANTS THEREOF, AND OTHERS: SUBJECT TO THE TERMS AND CONDITIONS AND TO THE MAKING OF PAYMENTS SPECIFIED IN THE ORDINANCE."

Because of its significance in understanding the issues of the case, Ordinance No. 16–85 is attached hereto as Appendix B.

An examination of Ordinance No. 16–85 of Casper evidences that a gas company operating without a franchise from the city, or one as to which the grant or franchise has expired and which has not obtained a license or a franchise from the city council, is deemed to be in violation of the ordinances of the city and subject to the penalties therefor, which include a fine of $200 per day with each day deemed a separate violation.[1] The ordinance contains a comprehensive set of regulatory conditions pursuant to which such a license would be issued. It specifically provides in § 21 that it is intended to implement Enrolled Act 70 of the Forty-eighth Legislature (Ch. 172, S.L. of Wyoming 1985).

Northern responded to the adoption of this ordinance by filing this case as a declaratory judgment action in the District Court of the Seventh Judicial District of the State of Wyoming in and for Natrona County on July 16, 1985. Northern alleged that the ordinance violated its rights to due process, equal protection, to be free from arbitrary laws and to uniform administration of the laws. It also alleged that Casper did not have authority to adopt the ordinance. In addition to its request for declaratory relief, Northern sought a preliminary injunction restraining Casper from enforcement of any of the provisions of the ordinance until such time as the district court could rule on its validity. Briefs were filed and argument was heard with respect to the requested preliminary injunction, and the preliminary injunction was denied.

The same day that injunctive relief was denied, Northern filed its motion for summary judgment requesting the district court to find the ordinance void in whole or in part. Additional briefs were filed; argument was heard; and the court then found that the ordinance did not violate any of Northern's constitutional rights, and, except for certain regulatory provisions in the ordinance, the district court held that Casper had authority to adopt it. The district court declared to be void selected provisions of the ordinance which it found to effect regulation of a public utility, holding that the municipality had no authority to adopt those provisions because of the exclusive regulatory authority granted by statute to the PSC. The court sustained the balance of the ordinance as coming within "the City's residual police power, its power to grant franchises pursuant to § 15–1–103(a)(xxxiii), Wyoming Statutes 1977, and the power to license, tax and regulate businesses pursuant to § 15–1–103(a), Wyoming Statutes 1977, and the savings clause, Section 23 of said Ordinance."

---

1. Section 22 of the ordinance provides: "Penalties. Violation of this Ordinance or any provision thereof shall be punishable in accordance with Section 1.7 of the Casper City Code. Each day of violation shall be deemed a separate violation."

By Section 1.7 of the Casper City Code, violation of the ordinance is a misdemeanor punishable by a fine of not more than $200 or by imprisonment in the city jail for a period not to exceed three months together with costs.

After entry of the court's order, Casper adopted Ordinance No. 26–85, which simply deleted those provisions of Ordinance No. 16–85 that had been nullified by the court. On December 13, 1985, Northern then filed a motion to alter or amend the judgment, specifically requesting the court also to declare § 21 of Ordinance No. 16–85 (the provision providing that the ordinance is adopted to implement Ch. 172, S.L. of Wyoming 1985) to be void. This latter motion was denied on January 23, 1986, and this appeal was taken from the summary judgment order and the order denying the motion to alter or amend the judgment. Casper has not appealed the nullification of §§ 2(6), 8, 9, 11, 15, 16(1), 18 and 19 of Ordinance No. 16–85, and that aspect of the court's ruling is not at issue in this appeal.

Section 15–1–103(a)(xxxiii)(C), W.S.1977, (1987 Cum.Supp.), grants to municipalities the authority to include certain provisions in a franchise initially granted, renewed or renewed after condemnation, but the authority granted in subparagraph (C) of that statute is not any different from the authority granted in subparagraphs (A) and (B). Subsection (b) of § 15–1–103, details those provisions that may be included in such a franchise agreement. The legislation, however, does not require a municipality to insist upon those provisions in a franchise, and, in fact, the operative verb is "may."

We need not address Northern's argument concerning the constitutionality of Ordinance No. 16–85. We have said many times that constitutional questions will not be discussed if another appropriate ground exists to resolve the issue. E.g., *Nehring v. Russell*, Wyo., 582 P.2d 67 (1978); *Schoeller v. Board of County Commissioners*, Wyo., 568 P.2d 869 (1977); *Stambaugh v. State*, Wyo., 566 P.2d 993 (1977); *Bowers v. Getter Trucking Company*, Wyo., 514 P.2d 837 (1973); *Pan American Petroleum Corporation v. Wyoming Oil & Gas Conservation Commission*, Wyo., 446 P.2d 550 (1968); *State ex rel. Fire Fighters Local 279, I.A.F.F. v. Kingham*, Wyo., 420 P.2d 254 (1966); *Marion v. City of Lander*, Wyo., 394 P.2d 910 (1964), cert. denied 380 U.S. 925, 85 S.Ct. 929, 13 L.Ed.

2d 810, reh. denied 380 U.S. 989, 85 S.Ct. 1352, 14 L.Ed.2d 283 (1965); *Gorrell v. City of Casper*, Wyo., 371 P.2d 835 (1962). Except for the specific sections of the ordinance which it found to conflict with the regulatory authority of the PSC, the district court held the ordinance to be valid. We are unable to sustain this ordinance under the theories adopted by the district court, or any other theory. We conclude that the constitutional questions need not be considered because Casper was without authority to adopt an ordinance like the one in issue in this case.

Neither will we invoke a concept similar to federal preemption principles as Northern urges us to do. We do not perceive a concept of preemption to be present in this case, at least as preemption generally has been understood. The federal preemption cases address a conflict between the powers reserved to each state in its sovereign role and the sovereign power granted to the federal government. See, e.g., *Gulf Oil Corporation v. Wyoming Oil and Gas Conservation Commission*, Wyo., 693 P.2d 227 (1985); *Industrial Siting Council of State of Wyoming v. Chicago & North Western Transportation Company*, Wyo., 660 P.2d 776 (1983). A municipality is not possessed of any sovereign power, either inherent or reserved. The question then becomes not whether the exercise of a state power has preempted a power reserved to a municipality, but instead, whether by some act of the legislature, the municipality has been granted the authority claimed.

Our rule in Wyoming is unequivocal. Municipalities, being creatures of the state, have no inherent powers but possess only the authority conferred by the legislature.

" * * * [M]unicipalities can exercise only those powers of government which are expressly or impliedly conferred." *City of Buffalo v. Joslyn*, Wyo., 527 P.2d 1106, 1107 (1974), citing *May v. City of Laramie*, 58 Wyo. 240, 131 P.2d 300, 312 (1942).

A court must analyze any pertinent constitutional proviso or appropriate statute for the purpose of determining whether express or implied authority has been conferred upon a municipality. *Haddenham v. City of Laramie,* Wyo., 648 P.2d 551 (1982); *City of Buffalo v. Joslyn,* supra. In deciding whether authority has been granted to a municipality to pursue a claimed governmental purpose, we apply a rule of strict construction, resolving any doubt against the existence of the municipal power. *Whipps v. Town of Greybull,* 56 Wyo. 355, 109 P.2d 805, 146 A.L.R. 596 (1941). If we find that appropriate authority has been conferred upon a municipality by the legislature, we then liberally construe the method invoked to exercise the conferred power, asking only if it is reasonable. *Whipps v. Town of Greybull,* supra. See also 2 E. McQuillin, Municipal Corporations §§ 10.18(a) through 10.21 at 789–800 (rev. 3rd ed. 1979).

■ The district court relied, in part, upon § 15-1-103(a)(xiii), W.S.1977 (1987 Cum.Supp.), to justify the adoption of those portions of Ordinance No. 16–85 that were not stricken. That statutory provision authorizes cities and towns to:

> "License, tax and regulate any business whatsoever conducted or trafficked in within the limits of the city or town for the purpose of raising revenue, and any license taxes imposed shall be uniform in respect to the class of business upon which imposed; * * *."

Public utilities, such as Northern, are included within the phrase "any business whatsoever." If this language were not limited in some way as to public utilities, however, the broad power granted to the municipality to regulate would conflict with the "general and exclusive power to regulate and supervise every public utility within the state in accordance with the provisions of this act" delegated to the PSC in § 37-2-112, W.S.1977. Any conflict is avoided by the legislative language that limits the authority of the municipality to license, tax and regulate for "the purpose of raising revenue." This style of limitation is not an unusual one. See 3 C. Sands

& M. Libonati, Local Government Law § 15.11 at 15–44 (1982).

Ordinance No. 16–85 cannot be sustained under the authority delegated to municipalities in § 15-1-103(a)(xiii), W.S.1977, (1987 Cum.Supp). The title of this ordinance does not suggest in any way that its purpose is to raise revenue, and the balance of the ordinance discloses that Casper did not adopt it for the purpose of raising revenue. Other than the potential fines to be collected for violation, the purpose of raising revenue appears only in § 14 of Ordinance No. 16–85, and that section appears to perpetuate the consideration for the expired franchise. Instead, the real purpose of this ordinance is set forth in § 21, which states that Casper "intends to implement Wyoming Statutes Enrolled Act 70, Forty-eighth Legislature [Ch. 172, S.L. of Wyoming 1985], by way of ordinances, resolutions, and rules and regulations." This specific statement of intent by Casper, when coupled with its failure to accommodate to the general limitations attaching to the authority to license for the purpose of raising revenue, forecloses the justification of this ordinance under the authority to license, tax and regulate.

Our conclusion in this regard is reinforced by the apparent disregard on the part of Casper of other limitations upon the authority of municipalities to license, tax or regulate for the purpose of raising revenue. The law imposes a requirement of reasonableness with respect to the business classification. 16 E. McQuillin, Municipal Corporations § 44.20 at 72 (rev. 3d ed. 1984). There is nothing about Ordinance No. 16–85 that justifies the choice to license only gas companies. Instead, it appears that the license imposed by the ordinance has not been required uniformly with respect to an appropriate class of business. Another general policy is recognized to avoid double taxation.

> "Although double taxation is not protected by the United States Constitution, double taxation is not favored, and all doubt concerning a conflict between a municipality and state relating to taxation is resolved against dual taxation." 16 E. McQuillin, Municipal Corporations,

supra, § 44.23 at 82. (Footnotes omitted.)

In this regard, the state has provided for a uniform state assessment of public utilities to defray the administrative expenses of the PSC for regulating and supervising them. Section 37–2–106, W.S.1977. The state tax is invoked to defray the expenses of the state accomplishing, under the authority delegated to the PSC, exactly the kind of regulation that Ordinance No. 16–85 purports to impose. On the face of the ordinance, no public purpose is suggested for the license payments to Casper required under § 14 of that ordinance, other than defraying the expenses of the regulatory activities of Casper. The redundancy of such charges makes them suspect under Art. 13, § 3 of the Constitution of the State of Wyoming.[2] See *Powers v. City of Cheyenne*, Wyo., 435 P.2d 448 (1967), reh. denied 436 P.2d 961 (1968).

■ There is no better prospect for sustaining this ordinance under any residual police power of Casper. The record does not clarify what the district court contemplated by its reference to a residual police power. The law is settled that, other than the United States of America, only the state, as sovereign, is possessed of inherent police powers. 6 E. McQuillin, Municipal Corporations § 24.35 at 107 (rev. 3d ed. 1988). This court has explained the police power vested in municipal governments in this way:

"* * * [T]he only powers possessed by municipalities are those delegated to them. *Stewart et al. v. City of Cheyenne*, 60 Wyo. 497, 154 P.2d 355. The police power is no exception. It is not inherent in municipalities. It is said in 37 Am.Jur. 905: 'In the absence of direct constitutional authorization, the generally accepted view is that any police power which a municipal corporation attempts to exercise must come from the source of the state police power, the state legislature.' And on page 902 it is said: 'The

prevailing view in this country is that the police power of municipalities exists solely by virtue of legislative or constitutional grant.' * * *" *Blumenthal v. City of Cheyenne*, 64 Wyo. 75, 186 P.2d 556, 563 (1947).

See also *Nation v. Giant Drug Company*, Wyo., 396 P.2d 431 (1964). The parties suggest, and we have discovered, only two possible sources of a grant of a police power to municipalities in the constitution and statutes.

By statute, cities and towns have authority to:

"Adopt ordinances, resolutions and regulations, including regulations not in conflict with this act and necessary for the health, safety and welfare of the city or town, necessary to give effect to the powers conferred by this act and enforce all ordinances by imposing fines not exceeding seven hundred fifty ($750.00), or imprisonment not exceeding six (6) months, or both; * * *." § 15–1–103(a)(xli), W.S.1977 (1987 Cum. Supp.).

By this provision, the legislature did not extend a general police power to the municipalities, which would exist independent of the express powers granted in §§ 15–1–101 through 15–10–117, W.S.1977 (1987 Cum. Supp.). Any police power that would justify this ordinance must relate to an authority otherwise expressed in those statutory provisions, and none appears. There is no residual police power that is contemplated by the statutory scheme.

The alternative source for some general grant of police power to municipalities is Art. 13, § 1(b) of the Wyoming Constitution (referred to frequently as the "home rule" amendment), which provides:

"All cities and towns are hereby empowered to determine their local affairs and government as established by ordinance passed by the governing body, subject to referendum when prescribed by the leg-

---

2. Art. 13, § 3 of the Constitution of the State of Wyoming provides:

"The legislature shall restrict the powers of such corporations [municipal corporations] to levy taxes and assessments, to borrow money and contract debts so as to prevent the abuse of such power, and no tax or assessment shall be levied or collected or debts contracted by municipal corporations except in pursuance of law for public purposes specified by law."

islature, and further subject only to statutes uniformly applicable to all cities and towns, and to statutes prescribing limits of indebtedness. The levying of taxes, excises, fees, or any other charges shall be prescribed by the legislature."

The court considered this constitutional provision in *Laramie Citizens for Good Government v. City of Laramie*, Wyo., 617 P.2d 474, 483 (1980), and said:

" * * * Plainly and without ambiguity it makes such legislation [municipal ordinances] 'subject to' statutes uniformly applicable to all cities and towns and to those prescribing limits of indebtedness. " ' * * * The term "subject to" means "subordinate to" or "subservient to." * * *' *Kelly v. Smythe*, 61 Wyo. 209, 226, 157 P.2d 289, 296 (1945). See *Chandler v. Hjelle*, N.D., 126 N.W.2d 141, 147 (1964).

"Legislation by cities and towns must not conflict with statutes uniformly applicable to cities and towns, and it must be subordinate and subservient to such statutes. Each enactment must be measured in its own right to determine if it pertains to a 'local affair' and if it is 'subject to' statutes uniformly applicable."

Even though the language of this constitutional provision is quite broad, the power of the legislature to control even the local activities of the municipality cannot be debated.

" * * * It is, accordingly, noted that it has been recognized from the very beginning of Wyoming that the legislature has the right to prescribe the powers and duties of municipalities and these include not only governmental affairs but strictly local affairs as well." *Stewart v. City of Cheyenne*, 60 Wyo. 497, 514, 154 P.2d 355, 360 (1944).

To the extent that a statute of the state in some way conflicts with a claimed power of the municipality, the municipal provision must yield, even with respect to any police power. The application of that principle results in a conclusion that the power to adopt the licensing ordinance in this instance could not be sustained under the general power granted by Art. 13, § 3 of the Wyoming Constitution.

State–wide regulation and supervision of public utilities is the subject of Title 37 of Wyoming Statutes 1977. "The public service commission of Wyoming," created by § 37–2–101, W.S.1977, has "general and exclusive power to regulate and supervise every public utility within the state in accordance with the provisions of this act." Section 37–2–112, W.S.1977. Normally, the power to license in accordance with police power implies authority to regulate. See 9 E. McQuillin, Municipal Corporations § 26.27 at 70 (rev. 3d ed. 1986). While some courts have held that allocation of regulatory power to a state agency does not foreclose the power to license, we have discovered no case suggesting that a municipality can license in accordance *with its police power* some activity which it cannot regulate. Furthermore, it generally is understood that the power to license, pursuant to police power, encompasses the power to prohibit the activity. See *Blumenthal v. City of Cheyenne*, supra; 9 E. McQuillin, Municipal Corporations, supra, § 26.31 at 79–80. The authority to grant a certificate of public convenience and necessity to a public utility to furnish services in a city or town and to terminate such services is in the PSC. It must approve the commencement or termination of public utility operations in a municipality whether or not a franchise has been granted or terminated between the municipality and the utility. See § 37–2–205, W.S.1977; Rules of the Public Service Commission of the State of Wyoming, Ch. 2, § 208 (1984). The scope of the authority granted to the PSC demonstrates a legislative intent that the police power of the state, to the extent that it relates to public utilities, shall be exercised by the PSC and to preserve none of that power for municipalities.

Neither can any implied police power be invoked to sustain this ordinance. A municipality does not have the authority to do indirectly anything that it has not been afforded authority to do directly. See *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees, School District No. 25, Fremont County*, Wyo.,

681 P.2d 1326 (1984). In accordance with our rule of strict construction, we hold that Art. 13, § 1(b), Constitution of the State of Wyoming, neither expressly nor by implication affords authority to Casper, in the management of its local affairs, to license a public utility.

The major emphasis by Casper is on its argument that the authority to license public utilities is to be found, at least by implication, in the power to grant franchises pursuant to § 15–1–103(a)(xxxiii), W.S. 1977 (1987 Cum.Supp.). That statutory provision provides, in pertinent part:

"(a) The governing bodies of all cities and towns may:

\* \* · \* \* \* \*

"(xxxiii) Grant franchises for such terms as the governing body deems proper to any utility company, provided no franchise may be entered into with any person in which that person is given an exclusive right for any purpose whatsoever and:

"(A) Grant to any franchisee utility company the privilege to install and maintain necessary installations under or over any streets, alleys or avenues;

"(B) Contract for a specified time period with any franchisee electric light or gas company for the necessary energy and service for the lighting of streets, public buildings or other requirements of the city or town;

"(C) Upon renewal or initial grant or renewal after condemnation of a franchise, may provide in the franchise that the franchisee shall furnish a gas distribution system through which any supplier, including the franchisee, may sell and distribute natural gas as provided by subsection (b) of this section, to any person served by the distribution system, provided that before any city or town implements this subparagraph, the question of whether or not to do so shall be submitted to and approved by a majority of the electors of the city or town voting on the question at a one-time election called for that purpose."[3]

Casper candidly recognizes that this section only encompasses authority to grant franchises, but it argues that, in other jurisdictions, courts use the terms "license" and "franchise" interchangeably, thus demonstrating any difference in these terms to be more semantical than substantive. This argument does not assist us in a determination in this case. If we were to accept this contention, we necessarily would conclude that the Wyoming legislature has used the terms "license" and "franchise" interchangeably or, in any event, intended them to be synonymous. We would have to do this because of our duty to discern municipal authority from legislative grants. An examination of the statutory scheme discloses the contrary.

Because the question of the claimed authority must be resolved only with respect to authority granted by statute, we invoke the pertinent rule of statutory construction. The primary objective in construing a statute is to discern the intent of the legislature. *McArtor v. State*, Wyo., 699 P.2d 288 (1985); *Hurst v. State*, Wyo., 698 P.2d 1130 (1985); *Sanches v. Sanches*, Wyo., 626 P.2d 61 (1981). That legislative intent is to be found, if possible, first in the express language of the statute, *Board of County Commissioners of Campbell County v. Ridenour*, Wyo., 623 P.2d 1174, reh. denied 627 P.2d 163 (1981); *Johnson v. Safeway Stores, Inc.*, Wyo., 568 P.2d 908 (1977); *Wyoming State Treasurer v. City of Casper*, Wyo., 551 P.2d 687 (1976). The express wording in § 15–1–103(a)(xxxiii), W.S.1977 (1987 Cum.Supp.), is that the municipalities are afforded the authority to grant franchises. The word "license" does not appear in the section.

**3.** Subparagraph (C) of § 15–1–103(a)(xxxiii) was part of Ch. 172, S.L. of Wyoming 1985. At the same time, subsection (b) of § 15–1–103 was adopted, which sets forth several requirements that must be satisfied under any contract entered into pursuant to the power granted the municipality by § 15–1–103(a)(xxxiii)(C). A general review of the history leading to the passage of these provisions can be found in Dee Pridgen & Edward W. Harris, *The Wyoming Natural Gas Consumers' Act of 1985: An Experiment in Controlling Natural Gas Prices and a Response to Indefinite Price Escalation Clauses*, 21 Land & Water L.Rev. 141 (1986).

Further analysis of this statutory provision makes it evident that the legislature did not intend the power to franchise to include the power to license or that those terms be treated synonymously. Section 15–1–101 states, in part:

"(a) As used in W.S. 15–1–101 through 15–10–117:

\* \* \* \* \* \*

"(v) 'Franchise' means the grant of authority to any person or firm by the governing body of any city or town to carry on the operation of a public utility; \* \* \*"

The definition found there ostensibly is in accord with the generally accepted understanding of the term "franchise."

" \* \* \* Speaking generally, a franchise is a special privilege of a public nature conferred by governmental authority upon individuals as such, or artificial personalities usually called corporations, and that privilege did not belong to the individuals generally as a matter of common right. It is a generic term embracing all rights granted to corporations by the legislature of the state, or such rights as can only be granted by the state in the first instance, that, by delegated authority, are conferred by the municipal corporation, or other designated public body, acting in such relation as an agency of the state. The right to conduct a business of public utility and use of the streets and public ways for this purpose, for example, to supply the public with water, light, transportation and other comforts and conveniences in crowded urban centers, is required to be conferred by public authority, and this constitutes the giving of a franchise. \* \* \*"
12 E. McQuillin, Municipal Corporations § 34.04 at 19 (rev. 3d ed. 1986).
See also 36 Am.Jur.2d *Franchises* § 1 at 722–723 (1968).

A municipal license, as distinguished from a franchise, generally is understood to have the effect of granting a privilege or permission to do an act that would be prohibited in the absence of the license. See 51 Am.Jur.2d *Licenses and Permits* § 1 at 7 (1970). The critical distinction between a municipal license and a municipal franchise is that the franchise extends a privilege that would not otherwise exist, while the license restricts, by governmental authority, a private right that has an independent existence, but has been limited in some way by a municipality through its appropriate police or revenue-raising power. The granting of a license then restores the right to pursue that activity subject to compliance with the licensed conditions. 9 E. McQuillin, Municipal Corporations, supra, § 26.01a at 8–9; 51 Am.Jur.2d *Licenses and Permits*, supra, §§ 1 through 4 at 7–13. It is in accord with this general proposition that the Wyoming legislature has granted municipalities the authority to license, tax and regulate businesses for the purpose of raising revenue. In the light of these provisions, we conclude that the legislature knew and applied a distinction between the terms "license" and "franchise" and did not use those terms synonymously in the statute.

We also find an expression of legislative intent that the power to franchise should not include the power to license in the restriction relating to when the municipality may exercise the authority granted to it in § 15–1–103(a)(xxxiii)(C). It may only do that "upon renewal or initial grant or renewal after condemnation of the franchise." In each such instance, the franchisee can accept, reject or propose modifications to the franchise terms offered by the municipal government. In contrast, no limitations are invoked as to when a municipality may exercise its authority to license under § 15–1–103(a)(xiii), W.S.1977 (1987 Cum.Supp.).

Further, as distinguished from the unilateral prerogative of a municipality to impose conditions on a license, this court has recognized that the negotiation of conditions in the process of granting a franchise creates a valid contract when accepted by a franchisee, and its conditions may be enforced in accordance with general rules applicable to contracts. *Northern Gas Company v. Town of Sinclair*, Wyo., 592 P.2d 1138 (1979). A license does not structure a contract but imposes reasonable restric-

tions or conditions on all members of a given class similarly situated. See 9 E. McQuillin, Municipal Corporations, supra, § 26.14 at 32–33. This is the reason that the legislature required that all license taxes imposed by a municipality be uniform in respect to the class of business upon which the tax is imposed. Section 15–1–103(a)(xiii), W.S.1977 (1987 Cum.Supp.). In contrast, there is no such requirement that all franchisees be afforded equivalent terms. Rather, the municipality may grant franchises "for such terms as the governing body deems proper." Section 15–1–103(a)(xxxiii), W.S.1977 (1987 Cum.Supp.).

Finally, the legislature's broad grant of regulatory power to the PSC supports our conclusion that it intended a restricted meaning to be applied to the authority to franchise under § 15–1–103(a)(xxxiii). The broad definition of "franchise" set forth at 12 E. McQuillin, Municipal Corporations, supra, § 34.04 at 19, is very like that which this court adopted in *Tri–County Electric Association, Inc. v. City of Gillette*, 584 P.2d 995, 1001 n. 6 (1978), to describe the privileges granted to public utilities by the PSC. It is apparent, in examining Ordinance No. 16–85, that it encompasses a substantial degree of the regulatory authority assigned by statute to the PSC. Indeed, that is why the trial court struck specific provisions of the ordinance. If the regulatory authority delegated to the PSC is appropriately described by the word "franchise," we are compelled to construe the language in § 15–1–103(a)(xxxiii), W.S. 1977 (1987 Cum.Supp.), very narrowly. Otherwise, the legislature might have structured a conflict between the municipal authority and the authority of the PSC, which, of course, would be the result if the words "franchise" and "license" are interchangeable. Avoidance of this potential for conflict is an additional reason to conclude that Casper had no authority to adopt its licensing ordinance pursuant to the franchising provision.

We hold that no grant of municipal authority to license public utilities exists under the authority conferred by statute to grant franchises. In accordance with the rule of strict construction, we furthermore conclude that the license is not essential or necessary to carry out the purpose expressed by the authority to franchise. See *Coulter v. City of Rawlins*, Wyo., 662 P.2d 888 (1983); *Blumenthal v. City Cheyenne*, supra; 2 E. McQuillin, Municipal Corporations, supra, § 10.12 at 768–776. Because the negotiated terms in a franchise agreement result in a valid contract when accepted by the franchisee, there is an adequate remedy available in the event of breach of the agreement. We also note that any attempt by a municipality to impose additional conditions on a valid franchise by invoking its police or revenue-raising power would lead to constitutional concerns relating to impairment of contracts. In the absence of any suggestion that the legislature so intended, this court will not extend through judicial fiat what the legislature has not chosen to express in statute.

There is a severability clause in Ordinance No. 16–85. We see no purpose in parsing the several provisions, however, because the stated intent of this ordinance was beyond the authority granted to a municipality by the legislature. We declare the ordinance to be void as being adopted without statutory authority.

The dilemma that confronts Casper with respect to a public utility operating without a franchise is not an issue in this case. It may be, with the slate now clean, that Casper can address the situation in some manner within its authority. Furthermore, the presence of a public utility operating in a municipality without franchise is not unique. The contractual relationship represented by the prior franchise between Casper and Northern no longer exists. The general rule seems to be that the utilization of a city's property, such as its streets and alleys, without a franchise, is unlawful. Recognizing the regulatory authority of the PSC, which must be invoked to terminate Northern's certificate of public convenience and necessity, may demand that the city approach the PSC. See Annotation, *Right and Duty of City and Public Utility upon Expiration by Limitation of Street Franchise*, 112 A.L.R. 625 (1938).

It may be that an action for damages for trespass is appropriate.

It is clear, however, that a city, no more than the state, has no authority to seize the property of a public utility, either directly or indirectly through a licensing process such as attempted by Casper in this case, or to dictate its business decisions in derogation of the constitutional rights of the corporation without providing compensation. Cf. *Nollan v. California Coastal Commission,* — U.S. —, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California,* — U.S. —, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Should Casper choose to exercise its statutory power of eminent domain, it then could become a municipal public utility, operating through its proprietary rather than governmental capacity, and subject to the jurisdiction of the PSC. See *Tri–County Electric Association, Inc. v. City of Gillette,* supra. An alternative approach would be to utilize the power of eminent domain and then sell the plant to some other corporation with which a new franchise could be made accomplishing that which Casper sought to coerce by virtue of Ordinance No. 16–85. Short of ouster, condemnation or an action for damages, Casper may choose to involve the PSC in its effort to reach agreement with Northern for a franchise by petitioning the PSC to take these issues into account in its rate-making process. *Mountain States Telephone & Telegraph Company and U S West Direct Company v. Public Service Commission of Wyoming,* Wyo., 745 P.2d 563 (1987).

The case is reversed with direction to enter judgment declaring Ordinance No. 16–85 to be void because it was adopted without authority.

CARDINE, J., filed a specially concurring opinion, in which MACY, J., joined.

## CHAPTER 172

Original Senate File No. 85

### NATURAL GAS FRANCHISES

AN ACT to amend W.S. 15-1-103(a)(xxxiii) by creating a new subparagraph (C) and by creating new subsections (b) and (c) relating to natural gas franchises; providing such franchises may be for providing a natural gas distribution system only thereby allowing any person to deliver natural gas through the system; providing for a vote of the electors; requiring annual reports to the public service commission; prohibiting certain increases in cost and price in purchase contracts for the resale of gas to franchise holders; specifying franchise conditions including liability; providing for repeal of the act unless continued by the legislature; and providing for an effective date.

*Be It Enacted by the Legislature of the State of Wyoming:*

**Section 1.** W.S. 15-1-103(a)(xxxiii) by creating a new subparagraph (C) and by creating new subsections (b) and (c) is amended to read:

**15-1-103. General powers of governing bodies.**

(a)   The governing bodies of all cities and towns may:

(xxxiii)   Grant franchises for such terms as the governing body deems proper to any utility company, provided no franchise may be entered into with any person in which that person is given an exclusive right for any purpose whatsoever and:

(C)   Upon renewal or initial grant or renewal after condemnation of a franchise, may provide in the franchise that the franchisee shall furnish a gas distribution system through which any supplier, including the franchisee, may sell and distribute natural gas as provided by subsection (b) of this section, to any person served by the distribution system, provided that before any city or town implements this subparagraph, the question of whether or not to do so shall be submitted to and approved by a majority of the electors of the city or town voting on the question at a one-time election called for that purpose.

(b)   Any franchise granted pursuant to subparagraph (a)(xxxiii)(C) of this section is subject to the following:

(i)   The franchise agreement shall specify who is responsible for deliverability;

(ii)   The distribution system shall continue to be a public utility whose charges are regulated by the public service commission. The charges shall reflect the reasonable nongas costs subject to management audit as the public service commission deems necessary plus a reasonable return on investment;

(iii)   Any city or town or its authorized representative shall act as an agent for any person served by the system in negotiating terms and conditions for the supply of natural gas to that person, and the franchisee distribution system shall accept for delivery to any person served by the system, natural gas from any supplier;

(iv)   The public service commission shall designate a place or places in the vicinity of the distribution system for the acceptance of natural gas not supplied by franchisee;

(v)   The public service commission shall adopt and enforce minimum quality standards for all gas delivered to the distribution system. These standards shall reflect the practices of the operators of the distribution system unless good cause is shown for different standards. The standards shall be designed to facilitate the comingling of gas from different suppliers;

(vi)   As soon as there are at least two (2) suppliers offering natural gas to all customers served by the franchisee and as soon as the additional supplier or suppliers are capable of delivering gas in at least one-third (1/3) of the volume required by the entire distribution system provided that the public service commission finds that the suppliers own or control, and have committed to guaranteed delivery, reserves of natural gas sufficient to supply ten (10) years of demand at that level, then all persons supplying gas shall have the authority to set their own prices. The proposed supplier has the burden of proving adequate reserves and deliverability. The Wyoming oil and gas commission shall report to the public service commission on the adequacy and deliverability when a utility gas supply is proposed to be displaced under this act;

(vii)   Subject to the availability of pipeline capacity and the requirements of federal law and regulations the public service commission may, after notice and hearing if necessary, designate any point in the state on a gas pipeline operated for the purpose of delivering gas to the distribution system or its parent or subsidiary company as a point for receipt of gas to the system and regulate the charges for shipping gas from that point to the system. If a pipeline has insufficient capacity the public service commission consistent with W.S. 30-5-125 may require it to accept gas that has a lower price to the consumer in preference to higher price gas. The public service commission may impose any conditions or requirements pursuant to this subsection that are necessary to protect the public health, safety and welfare, to ensure the efficient operation of the natural gas distribution and supply system and to ensure the lowest possible price to retail customers, including but not limited to proper assignment of costs of connecting suppliers to the system;

(viii)   When a city renews or grants a franchise for the supply of natural gas under subparagraph (a)(xxxiii)(C) of this section, the public service commission may require that the distribution of gas in surrounding unincorporated areas also be made subject to the terms of the same franchise;

(ix)   If a distribution system has only one (1) supplier of natural gas all prices charged in that franchise are subject to W.S. 37-2-121 and 37-2-122;

(x)   All suppliers of gas to the distribution system shall annually report to the public service commission the annual consumption of natural gas by their customers of record at the date of the report and their natural gas reserves. If their natural gas reserves are less than a five (5)

year supply, the public service commission may forbid any supplier from serving new customers until the reserves are equal to a five (5) year supply for all customers;

(xi)   Any supplier entering the system under this subsection is liable for injuries, damages or other losses to the extent to which the injuries, damages or other losses are proximately caused by the supplier's operations within the system and are due to failure of the supplier to exercise that standard of care which a reasonable, prudent person would exercise under the same or similar circumstances to avoid an undue risk of harm or are due to the supplier's failure to deliver contracted amounts of natural gas.

(c)   Any provision in a gas purchase contract which contains or creates an indefinite escalator clause, otherwise known as a "favored nation treaty" provision, is contrary to the public policy of the state and is void and unenforceable if:

(i)   The contract is to sell gas to the holders of a municipality franchise which supplies retail customers in the state;

(ii)   The contract provides for the sale in the state of gas produced within the state;

(iii)   The contract gas price is in excess of the general market price which would otherwise exist in the absence of the indefinite escalator clause; and

(iv)   The higher price resulting from the application of the escalator clause is not required by any enforceable provision of statutes or regulations enacted or adopted pursuant to the National Gas Policy Act of 1978 or other appropriate statutes and regulations of the United States.

**Section 2.**   If any provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions of application of the act which can be given effect without the invalid provision or application and to this end, the provisions of this act are severable.

**Section 3.**   Effective July 1, 1988, W.S. 15-1-103 (a)(xxxiii)(C) and (b) are repealed unless continued by an affirmative act of the legislature. The repeal of these provisions does not affect any franchise agreement made pursuant to these provisions prior to the effective date of their repeal.

**Section 4.**   This act is effective May 23, 1985.

Approved February 23, 1985.

## APPENDIX B

### ORDINANCE NO. __16-85__

AN ORDINANCE ESTABLISHING PROCEDURE AND REGULATIONS FOR A NON-EXCLUSIVE LICENSE TO ANY GAS COMPANY WITHIN THE CITY OF CASPER, WYOMING, OPERATING WITHOUT A FRANCHISE, A LICENSE TO CONSTRUCT, MAINTAIN, AND OPERATE IN, ON OR UNDER THE PRESENT AND FUTURE STREETS, ALLEYS, AND PUBLIC WAYS OF THE CITY OF CASPER, NATRONA COUNTY, WYOMING, A GAS DISTRIBUTION PLANT OR SYSTEM FOR THE PURPOSE OF SUPPLYING GAS AND GAS SERVICE TO THE CITY OF CASPER, THE INHABITANTS THEREOF, AND OTHERS: SUBJECT TO THE TERMS AND CONDITIONS AND TO THE MAKING OF PAYMENTS SPECIFIED IN THE ORDINANCE.

BE IT ORDAINED BY THE GOVERNING BODY OF THE CITY OF CASPER, WYOMING:

**Section 1.** Short Title. This Ordinance shall be known and may be cited as the "Gas Company Licensing Ordinance."

**Section 2.** For the purposes of this Ordinance, the following terms, phrases, words, and their derivations shall have the meaning given herein. When not inconsistent with the context, words in the plural number include the singular number, and words in the singular number included the plural number. The word "shall" is always mandatory and not merely directory.

(1) "City" is the City of Casper, Wyoming.

(2) "Company" is the grantee of a license under this Ordinance.

(3) "Council" is the City Council of the City of Casper, Wyoming.

(4) "Person" is any person, firm, partnership, association, corporation, company, or organization of any kind.

(5) "Gross Revenue" is all revenue derived from the sale of gas directly or indirectly by the Company in connection with the operation of its facilities within the City pursuant to this Ordinance; provided, however, that this shall not include any taxes upon the sale or distribution of gas furnished by the Company, imposed directly upon any customer or user by the State of Wyoming, the City, or other governmental entity, and collected by the Company on behalf of said State of Wyoming, City, or governmental entity.

(6) "Standard cubic foot" is a cubic foot of natural gas containing 1,000 British Thermal Units (BTU) per cubic foot when saturated with water vapor at 60°F, under pressure equal to 30 inches of mercury at 32°F. This standard shall apply in the case of natural, manufactured, or mixed gas. This standard shall be used as the basis for all pricing and measurements under this ordinance unless other standards are established by the Wyoming Public Service Commission or State Statute. Such other quality standards presently existing or as may be established by State Statute, the Wyoming Public Service Commission, or other regulatory body of competent jurisdiction shall also apply.

(7) "Sidewalk" is that portion of a street, other than the roadway set apart by curbs, barriers, markings, or other delineation for pedestrian travel, including parkways not on private property.

(8) "Street" is the entire width between the boundary lines of every way dedicated to the public use, and publicly maintained for the purposes of vehicular and pedestrian travel, including alleys.

(9) "City Manager" is that person designated by the Council to act in such capacity as defined by Wyoming Statutes.

(10) "License" is a written instrument executed by the Mayor or City Manager and attested to by the City Clerk authorized by resolution of Council granting to a gas company the privilege of operating within the City pursuant to the term of this Ordinance.

(11) "City Gate" shall be the point of transfer of gas from a supplier to Company within the proximity of the corporate limits of City.

Section 3. Any gas company who is operating without a franchise from the City, or whose grant or franchise has expired, and which Company has not by resolution obtained a license or franchise from the Council is deemed to be in violation under the ordinances of the City or the Statutes of the State of Wyoming and subject to the penalties therefore.

Section 4. Request for License. Company may request through the City Manager that a license be issued for a grant of authority to operate within City. Such request shall be for a license which shall conform to this Ordinance. Council at its discretion and as hereinafter provided may grant a license to Company.

Section 5. Grant of Authority. After Council approval by resolution a license shall be granted by the City to the Company for the right and privilege to erect, construct, operate, and maintain a gas plant, gas system, or both, and to import, transport, sell and distribute gas, whether natural, manufactured, or mixed, within the City, and for these purposes to establish the necessary facilities and equipment and to lay and maintain gas mains, service pipes, meters and regulators, and other appurtenances necessary to the sale and distribution of gas in and along the streets and alleys.

(1) Non-Exclusive Grant. The right to use and occupy said streets, alleys, public ways, and places for the purposes herein set forth shall not be exclusive, and the City reserves the right to grant a similar use of said streets, alleys, public ways, and places, to any person or corporation at any time during the period of this license.

Section 6. Compliance with Applicable Laws and Ordinances. The Company shall, at all times during the life of the license, be subject to all lawful exercise of the police power by the City, and to such reasonable regulation as the City shall hereafter by resolution or ordinance provide.

Section 7. Indemnification. Company shall fully indemnify, defend, and hold harmless the City, its officers, boards, commissions, and employees against any and all claims, suits, actions, liability, and judgments for damages, including, but not limited to, expenses for reasonable legal fees and disbursements and liabilities.

(1) To persons or property in any way arising out of or through the acts or omissions of the Company, its servants, agents, or employees, to which the Company's negligence or fault shall in any way contribute;

(2) Arising out of company's failure to comply with the provisions of any federal, state, or local statute, ordinance, or regulation applicable to the Company in its business hereunder.

Section 8. Service Standards. The Company shall maintain and operate its plant and system, and render efficient service in accordance with the rules and regulations as are, or may be, set forth by the Council as provided for in Section 13 of this Ordinance, or by the Public Service Commission of the State of Wyoming.

(1) Odorizing of Gas. Gas furnished to consumers within Casper, Wyoming, shall be of marketable quality as required by Public Service Commission except that it shall contain some element or compound with an easily detectable odor in an amount sufficient to be noticeable when the gas is released, but not sufficient to be harmful to human and animal life, or to interfere with combustion.

(2) Heating Value. Gas sold, supplied, and delivered under the license shall be determined according to standard conditions set forth in Section 2(6) hereof adjusted to conditions at Casper, Wyoming; and,

(a) Deviation. The adjusted heating value of the gas shall be maintained with as little deviation as practicable and such heating value shall never vary more than plus or minus five percent (+5%). If the monthly average value varies more than plus or minus five percent (+5%), the Council shall have the right to penalize the Company by requiring a refund to all customers on their appropriate monthly bills sufficient to compensate for the inefficiencies resulting from the excessive variation.

(b) Calorimeter Tests Required. The Company shall equip itself with a complete, standard calorimeter and shall determine the heat value of the gas at least daily. The tests may be made at any point within the limits of the distribution system. Test results shall be delivered to the office of the City Manager within 12 hours of said test. City may test said gas at such times as it deems necessary or advisable and shall make the results of its tests available to Company.

(c) Ascertaining Monthly Average. The monthly average adjusted heating value of the gas shall be obtained by averaging the heat value found as a result of all periodic calorimeter tests as provided hereunder. The Council shall have the authority to permit the Company to submit other proof of the quality of the gas, in lieu of individual tests made on the City mains, where such proof of quality is prepared for and accepted by other cities being served by the same Company on the same pipeline and from the same source or sources of supply or accepted by the Wyoming Public Service Commission.

(3) Meter Accuracy. All gas service shall be supplied through meters which shall accurately measure the amount of gas supplied to any customer.

(a) Compulsory Check. Every meter, whether complained of by a customer or otherwise, shall be removed from service at least once each ten (10) years and thoroughly tested for its accuracy. Any meter found inaccurate upon any test beyond a reasonable tolerance of two percent (2%) shall not be returned to service until properly adjusted as close as practical to zero variation.

(4) Notice of Interruption for Repair. Whenever it is necessary to shut off or interrupt service for the purpose of making repairs or installations, the Company shall do so at such time as will cause the least amount of inconvenience to its customers, and unless such repairs are unforeseen and immediately necessary, it shall give reasonable notice thereof to the consumers.

Section 9. Company Rules. The Company shall have the authority to promulgate such rules, regulations, terms, and conditions governing the conduct of its business as shall be reasonable necessary to enable the Company to exercise its rights and perform its obligations under the license, and to assure uninterrupted service to each and all of its customers. Provided, however, that such rules, regulations, terms, and conditions shall not be in conflict with the provision hereof or with the laws of the State of Wyoming, and shall be subject to approval by the Public Service Commission of the State of Wyoming.

### Section 10. Conditions on Street Occupancy.

(1) All pipes, mains, and other natural, artificial, or mixed gas equipment and apparatus laid or placed by the Company shall be so located in the streets, alleys, and other public placed in the City as not to obstruct or interfere with any water pipes, sewers, drains, or other structures already installed or hereafter to be installed. The Company shall, when practicable, avoid interfering with the use of any street, alley, or other highway when the paving or surface of the streets would be disturbed.

(2) Restoration. In case of any disturbance of pavement, sidewalk, driveway, or other surfacing, the Company shall at its own cost and expense, and in a manner approved by the City Inspector, replace and restore all paving, sidewalk, driveway, or surface of any street or alley disturbed in as good condition as before said work was commenced, and shall maintain the restoration in an approved condition for a period of one (1) year from completion of construction, and shall post such bond or security as may be required by the Council or its agents as shall be deemed necessary to effectuate the intent of this section.

(3) Relocation. In event that at any time during the period of the license the City shall lawfully elect to alter, or change the grade of, any utility line. street. alley, or other public way, the Company, upon reasonable notice by the City. shall remove, relay, and relocate its mains or service pipes, manholes. and gas fixtures at its own expense. The Company shall not place fixtures where the same will interfere with any other fixtures or the various City-owned facilities serving the residents of the City. The Company agrees that the City Engineer may in his discretion, set the time period during which Company may construct, locate, repair, or maintain its facilities in arterial streets in order to prevent traffic hazards and congestion on said arterial streets, provided, however, that in the event of an emergency, nothing herein stated shall prevent the Company from performing necessary repairs.

The Company is required to place on file in the office of the City Engineer a complete and true copy of its most recent, revised plat or maps, or set of plats or maps, showing the location of mains, valves, curb boxes and other appurtenances, as often as revisions of the same are made; provided, however, that the Company shall not be required to file such revised plat or set of plats more frequently than once in each calendar year. The Company shall be required, at its expense, to provide the City with its plans for replacement of existing facility. or installation of new facilities within existing or future City streets one (1) year in advance of any proposed construction or replacement. In addition, construction plans for construction, repair, or replacement of facilities being installed in or under existing improved streets shall be submitted to the City Engineer a minimum of thirty (30) days prior to commencement of actual work, except in the event of an emergency. Where practical, facilities being installed under improved streets shall be pushed or bored under such streets in such a manner that the existing improved street is not disturbed unless open cutting has been previously approved by the City Engineer's Office.

Whenever the Company is working in any street, proper and adequate warning signs shall be used, as required by and to the satisfaction of the City Engineer's Office and any applicable City Ordinance or State Statute. In the event a street is left unrepaired at the end of a normal working day, the Company shall perform all necessary cleanup work and erect and monitor such signs as are adequate to provide notice to the public of the street conditions, said cleanup and signage shall be subject to approval by the City Engineer's Office.

Any street opening made for installation or repair of facilities shall be closed within a maximum of five (5) working days of the making of the opening; and said opening shall be permanently repaired and resurfaced to City standards, as soon as thereafter as possible. In any event, said street opening shall be subject to permit approval by the City Engineer's Office in accordance with any Ordinance regulating the same during the term of the license. In the event the Company shall fail to close any street opening within the maximum period specified herein,

the City shall be, and is hereby authorized by the Company to repair and resurface the street opening; and the Company agrees to pay all costs incurred by the City in doing the same upon demand of the city. In the discretion of the City, the Company shall deposit and maintain cash or post bond in lieu thereof with the City the sum of Five Thousand Dollars ($5,000.00) to be used in the event Company fails to close a street to a condition satisfactory to the City Engineer's Office within the time specified. Upon the failure of the Company to close a street opening in the time specified, for failure to make such cash deposit or post bond when notified by the City Engineer's Office to do so, or both, the Company shall be refused any permit or permits thereafter required to be issued or obtained for the opening of any streets in the City until such violation is rectified to the satisfaction of the City Engineer.

Section 11. Preferential or Discriminatory Practices Prohibited. The Company shall not, as to rate, charges, service facilities, rules, regulations, or in any other respect, make or grant any person, nor subject any person to any prejudice or disadvantage, provided that nothing in this license shall be deemed to prohibit the establishment of a graduated scale of charges and classified rate schedules to which any customer coming within such classification would be entitled, subject to such rules and regulations as are now in effect or that may hereafter be lawfully made by the Public Service Commission of the State of Wyoming.

Section 12. Approval of Transfer. The Company shall not sell or transfer its plant or system to another, nor transfer any rights under this License to another without Council approval. Provided, that no sale or transfer shall be effective until the vendee, assignee, or lessee has filed in the office of the City Clerk an instrument, duly executed, reciting the fact of such sale, assignment or lease, accepting the terms of the license, and agreeing to perform all the conditions thereof, and such other information as may be submitted to the Public Service Commission.

Section 13. Rules and Regulations.

(1) Municipal Rules. The City may adopt such rules and regulations as it deems necessary in the exercise of its powers to further the provisions of this ordinance.

(2) Inspection. The City shall have the right but not the duty to inspect all construction or installation work performed subject to the provisions of this Ordinance.

(3) Nothing contained herein shall be construed as a limitation on, or prohibition of, the right of the City to exercise its right of eminent domain.

Section 14. Payment to City. The Company shall pay to the City for the privilege of operating a gas system under the license a sum equivalent to:

(a) All sums which would have been due and payable to the City from the date of the expiration of any former franchise agreement, plus interest thereon at 10% per annum if the Company was operating under any former franchise, agreement, or ordinance, or otherwise operating a gas company within the City.

(b) Said sum shall be paid prior to the issuance of the License to the Company.

(c) One percent of the monthly gross revenues taken in and received by it on all sales of gas within the City, which shall be paid monthly after determination of the monthly gross revenue.

Section 15. Rates. Rates charged by the Company for service hereunder shall be fair and reasonable, and designed to meet all necessary costs of the service, including a fair rate of return on the net valuation of its properties devoted thereto, under efficient and economical management. The Company shall be subject to all authority now or hereafter possessed by the City, or any other regulatory body having competent jurisdiction, to fix just, reasonable, and compensatory gas rates.

(1) Savings to Customers. If during the term of the License the Company received funds, or if the cost to the Company of the natural, manufactured, or mixed gas sold under the license is reduced, by order of any regulatory body having competent jurisdiction the Company shall pass on to its consumers such refunds or any savings resulting therefrom.

Section 16. Records and Reports. The City shall have access at all reasonable hours to all of the Company's plans, contracts, and engineering, accounting, finance, statistical, customer, and service records relating to the property and the operations of the Company and to all other records required to be kept hereunder. The following records and reports shall be filed with the City Clerk and in the local office of the Company:

(1) Calorimeter Tests. Copies of all calorimeter tests required hereunder.

(2) Company Rules and Regulations. Copies of such rules, regulations, terms, and conditions adopted by it for the conduct of its business relating to delivery of natural gas to customers within the City.

(3) Gross Revenue. There shall be delivered to the City Manager a monthly summary report showing gross revenues received by the Company from its operations within the City during the preceding month and such other information as the City shall request with respect to properties and expenses related to the Company's service within the City.

(4) Complaints. Company shall deliver to City's Manager, copies of all written complaints which it receives from customers and/OR the Public Service Commission relating to the company"s performance of the terms and conditions of this ordinance. Such complaints shall be delivered within thirty (30) days of receipt.

Section 17. Term of License. The License and rights herein granted shall take effect and be in force from and after adoption of resolution by Council and issuance by City. Company shall file an acceptance of the terms of the license as established by this Ordinance with the City Clerk, and the License shall continue in force and effect for a term of one (1) month after the effective date of license issuance. Provided, that if an acceptance is not filed the Company shall be considered in violation of this Ordinance. Upon acceptance by Company, the license shall continue in full force and effect from month to month until the Mayor or City Manager at the direction of the Council shall provide written notice to the Company of the termination of said license. Termination shall become effective thirty days from the date of said notice.

Section 18. Billing Procedures and Information Contained Thereon. Company's billing statements to customers within the City shall include such information as may be required by City. After January 1, 1986, billings shall include an itemization of the cost of the gas to the Company in a standard MCF; the cost of distribution; tax; and the cost per therm to the customer.

Section 19. Notice of Rate Filing. Company shall during any term of license authorized pursuant to this Ordinance and granted by City notify in writing the City Manager or any Federal or State rate making filing, cost adjustments, or other action which would have a monetary affect upon the City or it's inhabitants. On the date of any such filing Company shall also file with the City Manager's Office a duplicate copy of any and all documents or materials filed with said agency.

Section 20. Waiver. The waiver of any breach of any of the terms or conditions of this License shall be limited to the act or acts constituting such breach, and shall never be construed as being a continuing or permanent waiver of any such terms or conditions, all of which shall be and remain in full force and effect as to future acts or happenings notwithstanding any such individual waiver or any breach thereof.

Section 21. State Statutes and Regulation. City intends to implement Wyoming Statutes Enrolled Act 70, Forty Eighth Legislature, by way of 'ordinances, resolutions, and rules and regulations. Any license issued pursuant to the terms of this ordinance is subject to all rights and privileges granted to the City by Enrolled Act 70, Forty Eighth Legislature or any other statute of the State of Wyoming, including the right of eminent domain. In event of conflict between this ordinance and State Statute or Public Service Commission Regulation the State Statute or Regulation shall prevail.

Section 22. Penalties. Violation of this Ordinance or any provision thereof shall be punishable in accordance with Section 1-7 of the Casper City Code. Each day of violation shall be deemed a separate violation.

Section 23. Severability. If any section, provision, clause, or sentence hereof shall be held invalid, it shall not effect the validity of the remaining portions of this Ordinance.

Section 24. Effective Date, Repealer. The effective date of this Ordinance shall be July 10, 1985.

Section 25. This Ordinance shall be in full force and effect from and after passage on three readings.

PASSED on 1st reading the _19th_ day of ___March___, 1985.

PASSED on 2nd reading the _21st_ day of ___May___, 1985.

PASSED, APPROVED, AND ADOPTED this _2nd_ day of ___July___.
1985.
APPROVED AS TO FORM:

ATTEST:

Calvin L. Chadsey
City Clerk

CITY OF CASPER, WYOMING
A Municipal Corporation

Mary L. Behrens
Mayor'

CARDINE, Justice, specially concurring, with whom MACY, Justice, joins.

I concur in the opinion of the court because ordinance number 16–85 was not within the power conferred upon the City by the legislature in amending and reenacting chapter 172, Session Laws of Wyoming 1985, entitled Natural Gas Franchises, § 15–1–103, W.S.1977, as amended. Appellant K N Energy, Inc. was supplying natural gas to residents of the City of Casper through its gas distribution system at a cost which appellee claimed far exceeded the price at which gas could be purchased in the open market and supplied to K N Energy. It was the intent of the legislature in amending and reenacting § 15–1–103 to empower the City (and other municipalities) to arrange for a less expensive source of gas and provide for delivery of such less expensive gas to its franchisee, K N Energy, Inc., for distribution through K N Energy's gas distribution system to customers in the municipalities.

A public utility must satisfy two requirements precedent to the exercise of privileges of a public utility in a municipality in the State of Wyoming. A public utility must obtain from the public service commission a certificate of convenience and necessity, as provided by § 37–2–205, W.S. 1977, and must obtain a franchise from the municipality, as required by Art. 13, § 4, Wyoming Constitution and § 15–1–103(a)(xxxiii), W.S.1977, as amended. The franchise under which K N Energy operates in the City of Casper expired December 31, 1984. The City of Casper has not renewed the franchise of K N Energy. K N Energy, then, has been oper-

ating illegally without a franchise in the City of Casper.

Section 15–1–103(a)(xxxiii)(C), as amended, provides that:

"The governing bodies of all cities * * * may * * * [u]pon renewal * * * provide in the franchise that the franchisee shall furnish a gas distribution system through which any supplier, including the franchisee, may sell and distribute natural gas as provided by subsection (b) * * *."

Section 15–1–103 then provides that the question of whether or not another supplier could supply gas to the franchisee's system must be submitted to and approved by a majority of the electors of the city; that the public utility continue to be regulated by the public service commission and be compensated for non-gas costs in the delivery; that the public service commission adopt and enforce minimum quality standards for gas delivered; that the gas offered for delivery to the public utility be sufficient to supply ten years of demand; and other requirements, including reporting to the public service commission.

I find § 15–1–103, as amended, entirely appropriate as within the scheme of franchising the creation, construction and operation of public utilities in the State of Wyoming. Section 15–1–103(a)(xxxiii) provides that

"no franchise may be entered into with any person in which that person is given an *exclusive* right for any purpose whatsoever * * *." (Emphasis added.)

Because the statute prohibits issuance of an exclusive franchise, the City of Casper could (a) issue a franchise to another utility; (b) itself construct distribution lines alongside those of appellant and compete with appellant for customers purchasing gas; (c) condemn appellant's gas distribution system as provided in § 15–1–103(a)(xxxiii)(C), which makes reference to "renewal after condemnation of a franchise"; or (d) require that its franchisee accept gas from another supplier and distribute it through its gas distribution system. The statute, as amended, seems clearly to further a state policy promoting competition among gas suppliers and distributors toward an end result that gas be furnished to Wyoming residents at the fairest and least expensive cost obtainable. K N Energy presently has no competition in supplying gas to residents of the municipality of Casper. The possibility of competition, however, is always present, and that is a benefit to purchasers of gas that is intended by our constitutional and statutory scheme for regulating public utilities.

Section 15–1–103, as amended, left the licensing power and supervisory and regulatory authority in the public service commission as provided in Title 37, Wyoming Statutes, 1977. The City of Casper attempted, in ordinance number 16–85, to assume supervisory, regulatory, and licensing functions not granted the City by enactment of amended § 15–1–103. Had the City of Casper exercised only those powers granted in § 15–1–103 and already discussed, I would have no hesitancy in upholding its ordinance.